UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

REBECCA LASALLE CANO                    CIVIL ACTION NO. 6:17-cv-00951

VERSUS                                   JUDGE TRIMBLE

U.S. COMMISSIONER,                       MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be reversed and remanded

for further administrative action.

### ADMINISTRATIVE  PROCEEDINGS

The claimant, Rebecca Lasalle Cano, fully exhausted her administrative

remedies before filing this action in federal court.  She filed an application for

disability insurance benefits ("DIB"), alleging disability beginning on February 25,

2013.[1]  Her application was denied.[2]  She then requested a hearing, which was held

on December 14, 2015 before Administrative Law Judge Carolyn Smilie.[3]  The ALJ

---

[1]      Rec. Doc. 8-1 at 148.

[2]      Rec. Doc. 8-1 at 89.

[3]      The hearing transcript is found at Rec. Doc. 8-1 at 47-76.

issued a decision on February 25, 2016,[4] concluding that the claimant was not disabled within the meaning of the Social Security Act from February 25, 2013 through the date of the decision.  The claimant asked for review of the decision, but the Appeals Council concluded that there was no basis for review.[5]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).  The claimant then filed this action seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on August 10, 1974.[6]  At the time of the ALJ's decision, she was 42 years old.  She has a bachelor's degree and relevant work experience as a registered nurse,[7] particularly in the fields of home health nursing and hospice care.[8] She alleged that she has been disabled since February 25, 2013[9] due to peripheral

---

[4]    Rec. Doc. 8-1 at 21-35.

[5]    Rec. Doc. 8-1 at 5.

[6]    Rec. Doc. 8-1 at 77, 148.

[7]    Rec. Doc. 8-1 at 50.

[8]    Rec. Doc. 8-1 at 51, 168, 183.

[9]    Rec. Doc. 8-1 at 148.

neuropathy, narcolepsy, restless leg syndrome, lower back pain, anxiety, and depression.[10]

In 2007, the claimant was seen at The Neurology Center in Houston, Texas for restless leg syndrome.[11]  Nerve conduction studies of her legs were conducted in December 7, 2007, and the results were normal.[12]  Correspondence from Dr. Steven M. Lovitt of The Neurology Center, dated December 17, 2007, indicated that he diagnosed the claimant with restless leg syndrome and, in consultation with another physician, prescribed Neurontin.[13]  Electromyography testing of her legs conducted in August 2010 revealed sensory peripheral neuropathy without denervation that was not present when the previous study was conducted in 2007.[14]

The claimant's primary care physician is Dr. Jason D. Landry.  When the claimant saw Dr. Landry for bronchitis on February 7, 2013,[15] she was already taking Lexapro, Ativan, Mirapex, Ultram, and Amantadine.  She started taking Lyrica,

---

[10]      Rec. Doc. 8-1 at 77, 166.

[11]      Rec. Doc. 8-1 at 345-346.

[12]      Rec. Doc. 8-1 at 349-350.

[13]      Rec. Doc. 8-1 at 343-344.

[14]      Rec. Doc. 8-1 at 347-348.

[15]      Rec. Doc. 8-1 at 326-327.

prescribed by Dr. Landry, on February 20, 2013.[16]  On May 23, 2013,[17] the claimant complained to Dr. Landry of worsening neuropathic pain in both feet that had not responded to medications.  Twice daily Lyrica had been attempted but it resulted in intolerable somnolence.  Dr. Landry noted that the claimant had Type II diabetes, which was diagnosed after the onset of her neuropathic symptoms.  Dr. Landry also noted that he had known the claimant for approximately a year while working with her at AAA Hospice, that she struggled with neuropathic pain, that she was being treated by a neurologist, and that the medications prescribed for that condition frequently caused excessive sedation and somnolence.  He noted:  "There were several times when [the claimant] would fall asleep while working at her desk and when speaking to supervisors.  Also, it was witnessed that she was sleeping in her car while at a patient's home.  I had advised her several months ago that given the nature of the side effects of her treatment it would be best that [the claimant] discontinued in her current line of work given the necessity for alertness in order to make and execute medical decisions."  Dr. Landry's diagnoses were unspecified neuralgia, neuritis, and radiculitis, which he described as "worsening."

---

[16]      Rec. Doc. 8-1 at 324.

[17]      Rec. Doc. 8-1 at 487-489.

The claimant returned to Dr. Landry on June 3, 2013 for follow up with regard to bilateral peripheral neuropathy.[18]  Nuvigil had been added to her medications to help with the excessive daytime sleepiness, but Dr. Landry noted that its effectiveness wore off by noon.  He also noted that an increase in her Lyrica dosage had improved her symptoms.  Examination showed a decrease in sensation over the plantar surface of the claimant's bilateral toes and an inability to distinguish between goal and sharp sensation throughout the entire plantar surfaces of her feet.  Dr. Landry diagnosed unspecified neuralgia, neuritis, and radiculitis; uncontrolled type II diabetes mellitus, unspecified essential hypertension, and obesity.  He continued her medications, including Mirapex, Lyrica, Nuvigil, and Ultram.

On June 13, 2013,[19] Dr. Landry opined that the claimant's neuralgia resulted in her being unable to stand/sit/walk for more than ten to fifteen minutes at a time and further opined that her frequent and spontaneous narcolepsy was a further limitation on her functionality.  He opined that she was capable of only light or sedentary work.

The claimant again saw Dr. Landry on July 11, 2013.[20]  She reported an increasing pain level despite compliance with an increased Lyrica dosage, and she

---

[18]     Rec. Doc. 8-1 at 317-318.

[19]     Rec. Doc. 8-1 at 484-486.

[20]     Rec. Doc. 8-1 at 495-496.

reported a decrease in sleepiness with Nuvigil. Her Lyrica dosage was adjusted, and she was started on Hydrocodone-Acetaminophen as needed for the neuralgia. She was to continue taking Wellbutrin and Lexapro for her depressive disorder and Mirapex for restless leg syndrome.

When the claimant returned to Dr. Landry on July 25, 2013,[21] her neuralgia, neuritis, and radiculitis were again described as worsening. She was to continue her medications, which included Mirapex for restless leg syndrome, Nuvigil for narcolepsy, and Lyrica and Vimpat for neuralgia. Wellbutrin and Metformin were started in August 2013.[22]

On September 5, 2013, the claimant followed up with Dr. Landry concerning bilateral lower extremity neuropathic pain, drug-induced narcolepsy, hypertension, and obesity.[23] Her symptoms were described as stable and improving since initiating treatment, although numbness was increasing. She was taking Nuvigil only as needed. A lower dose of Hydrocodone-Acetaminophen was prescribed, she was started on Pregabalin, and the Metformin dosage was increased. The other medications were continued.

---

[21]     Rec. Doc. 8-1 at 309.

[22]     Rec. Doc. 8-1 at 308.

[23]     Rec. Doc. 8-1 at 303-305.

Dr. Landry again opined on the claimant's functionality on September 12, 2013,[24] mirroring the opinions set forth in his previous report.

The claimant next saw Dr. Landry on October 29, 2013.[25]  She reported a recent increase in pain, which Dr. Landry correlated to the claimant's increased stress level related to the discovery of a breast mass and caring for her emotionally disturbed niece.  The Nuvigil dosage was increased, and other medications were continued.  On November 12, 2013, diagnostic mammography and left breast ultrasound revealed no evidence of malignancy in the claimant's breasts.[26]

The claimant returned to see Dr. Landry on December 11, 2013.[27]  She reported that any skipped doses of Lyrica resulted in intolerable pain that required the use of narcotic medication.  She also reported that taking Nuvigil everyday made it less effective.  She complained of long standing abdominal and rectal pain, which was concerning because her mother had been diagnosed with colon cancer.  Her medications were continued.

---

[24]      Rec. Doc. 8-1 at 492-494.

[25]      Rec. Doc. 8-1 at 300-301.

[26]      Rec. Doc. 8-1 at 337.

[27]      Rec. Doc. 8-1 at 295-296.

On February 17, 2014, an MRI examination of the claimant's lumbar spine showed bilateral facet hypertrophy at L3-L4, L4-L5, and L5-S1, with no evidence of stenosis.[28]

When the claimant returned to Dr. Landry on February 18, 2014, she reported a worsening of depression, sedation, and pain.[29]  She also reported that her pain was manageable as long as she remained sedentary with her legs elevated but ambulation and standing both exacerbated the pain.  She was noted to be in obvious pain and crying, and Dr. Landry described her depressive disorder as worsening.  He also referred her to a headache and pain center for evaluation and treatment.  He added Abilify to her medication regimen and continued her other medications.

Dr. Landry again opined on the claimant's functionality on February 19, 2014,[30] expressing the same opinions set forth in his two earlier reports.

On February 21, 2014, Dr. Adolfo J. Cuadra of the Headache & Pain Center wrote to Dr. Landry with regard to his examination of the claimant for low back pain radiating to the right of her spine and burning and shocking neuropathy in both feet.[31]

---

[28]    Rec. Doc. 8-1 at 336.

[29]    Rec. Doc. 8-1 at 290-291.

[30]    Rec. Doc. 8-1 at 500-502.

[31]    Rec. Doc. 8-1 at 339-341.

At the time of the examination, the claimant described her pain as 10/10 on a ten point scale. She told Dr. Cuadra that her low back pain started in 2008 after she gave birth, improved for a while, then worsened again over the two previous years. She stated that the pain in her feet caused more distress than the pain in her back. She also reported that the pain was aggravated by standing, bending, twisting, housework, yard work, and walking. She reported that bed rest and Lyrica improved her pain. She complained of fatigue for more than five years and had a rash secondary to seborrheic psoriasis. She indicated that she was being followed by Dr. Alvarez for gastroesophageal reflux disease. The claimant was 5' 7" and weighed 284.4 lbs. Examination revealed positive bilateral greater trochanteric tenderness, intact lower extremity strength, midline tenderness from L4 to L5, positive bilateral SI joint tenderness right greater than left, and facet tenderness from L4 to S1. Sensation to pin prick remained intact in both legs and reflexes were essentially normal. Dr. Cuadra's impressions were lumbar spondylosis, lumbar radiculopathy, and peripheral neuropathy. He recommended lab work for arthritis. He also recommended a caudal epidural steroid injection, but the claimant decided against the procedure.[32]

---

[32]    It was noted later in the record that her insurance did not cover this procedure. Rec. Doc. 8-1 at 276-277.

On March 7, 2014, the claimant saw Dr. Landry again.[33] After being on Abilify in addition to Lexapro and Wellbutrin for depression, the claimant reported a modest improvement in her symptoms with less crying and feeling more positive. Her thoughts had also become "clear." Dr. Landry reported that she had been examined by a gastroenterologist for her abdominal pain with no etiology yet determined. Her medications were continued.

On March 24, 2014, the claimant again saw Dr. Landry.[34] She reported that she had discontinued the Abilify because it caused intolerable weight gain and swelling. Ventolin was prescribed for asthma, and her other medications were continued.

The claimant returned to Dr. Landry on April 21, 2014.[35] An attempt had been made to decrease the Wellbutrin dosage but this resulted in an exacerbation of anxiety, and the higher dose was resumed. She complained of worsening bilateral lower extremity pain following periods of increased physical activity. She reported that Dr. Cuadra had recommended lumbar epidural steroid injections, but her insurance did not cover that procedure. She also reported that her restless leg syndrome symptoms were worsening. Dr. Landry was uncertain whether this was

---

[33]    Rec. Doc. 8-1 at 287-288.

[34]    Rec. Doc. 8-1 at 283-284.

[35]    Rec. Doc. 8-1 at 276-277.

separate from her neuropathic pain.  The dosage of Escitalopram Oxalate was increased, and she was referred to Louisiana Pain Management.

The claimant saw Dr. Landry again on July 21, 2014.[36]  The treatment note indicates that the claimant's diabetes had worsened, and she admitted being less than compliant with the recommended low carbohydrate diet.  She complained of pain in her bilateral wrists, hands, ankles, and feet, and reported that a work up for rheumatoid arthritis was unremarkable.  Her pain was worsening to the extent that she was sometimes unable to get out of bed.  Her depression had also worsened.  Dr. Landry added a diagnosis of pure hyperglyceridemia and prescribed Trilipix.

The claimant saw psychiatrist Dr. David Craft at Abbeville General Hospital Rural Health Clinic Psychiatry Clinic on July 25, 2014.[37]  She was referred for evaluation of mood disorder and chronic pain secondary to peripheral neuropathy. Her primary complaint was "I need my life back."  She reported that she had treated with a psychiatrist in California from 2004 to 2008 but was treated with Zoloft, experienced a sixty pound weight gain, and her depression accelerated to the point that she began to have panic and dysphoria.  She reported that combining Wellbutrin with Zoloft helped but she had continued to gain weight, which had worsened the

---

[36]    Rec. Doc. 8-1 at 373-376.

[37]    Rec. Doc. 8-1 at 535-540.

-11-

neuropathy. She reported having seen multiple neurologists and her primary care physician in an attempt to manage her pain, dysphoria, and sadness. She reported currently taking Wellbutrin XL, Ativan, Nuvigil, and Lexapro as well as Lyrica, Vimpat, Tramadol, and Norco. The claimant reported that her pain was debilitating to the point that she cannot focus, concentrate, or work throughout the day. She also reported that she could not drive without falling asleep.

A mental status examination revealed that the claimant became tearful easily, had a constricted affect, and a sad, hopeless mood. There was no evidence of auditory or visual hallucinations and no evidence of suicidal or homicidal ideation. She was preoccupied with worry about pain and discomfort. Her insight and judgment were deemed globally impaired. She was quite anxious but alert and oriented. Her long term and short term memory appeared to be intact, and her overall fund of knowledge was above average.

Dr. Craft's goal was to simplify her medication regimen. He recommended stopping Nuvigil and Lexapro, maintaining Lyrica, Tramadol, Vimpat, and Norco, and starting a trial of Viibryd. Additional goals were improving the claimant's social interactions and attempting to improve her work functioning. Dr. Craft diagnosed a depressive disorder, secondary to chronic pain/neuralgia.

On August 8, 2014, the claimant again met with Dr. Craft.[38]  She had added Viibryd, discontinued Nuvigil, reduced Vimpat and Tramadol but experienced increased pain, which led to taking Norco more frequently.  She reported being more vigilant with managing her diabetes,  She appeared marginally brighter and was not as tearful.  Her affect was constricted, her mood was sullen, her thought processes were non-spontaneous but when elicited were trackable and logical.  She continued to be preoccupied with pain, losses, and life stressors.  She was distressed because she was unable to work.

Dr. Craft's plan was to increase the Viibryd dose and maintain the Wellbutrin dose.  He stated that "it is my opinion at this time that [the claimant] is not able to work with the level of current medications and level of cognitive impairment that may go along with it in terms of awareness and potential sedation, as well as impairment of overall concentration, [and] I would be hesitant to endorse this young lady working.  Certainly with the level of her mood disturbance, it certainly would impede her ability to be appropriate with patients and conduct herself appropriate[ly]."  It was also his  "opinion. . . that she would not be able to maintain full employment as a nurse and with her current physical difficulties, would have difficulty in terms of maintaining any employment at this time. . . ."

---

[38]    Rec. Doc. 8-1 at 532-534.

On August 20, 2014, the claimant began treating with Dr. Stuart A. Begnaud.[39] Dr. Landry had asked Dr. Begnaud to evaluate and treat the pain in her wrists, hands, ankles, and feet. She described her pain as an unbearable, constant, and lasting twenty-four hours a day at 10/10 but worse at night. She reported that she is always awakened at night by pain. She claimed to be sore and stiff with sharp pain across the lumbar spine. She complained of restless leg syndrome symptoms in both calves. She complained of burning, numbness, and sharp pain to the bottoms of her feet as well as pain in her low back, wrists, and hands. She was visibly upset and crying. She said her pain improved with medication, rest, and elevating her legs but worsened with standing and walking. She complained of anxiety, depression, mood swings, tenseness, and feeling stressed. Although Dr. Begnaud's examination revealed normal extremities, he noted that she walked with a cautious, swaying, waddling gait that was slow and wide-based with abducted arms and toe walking. Dr. Begnaud prescribed Pennsaid, and he recommended that the claimant see a gynecologist to rule out hormonal influences, that she see a pulmonologist to rule out obstructive sleep apnea or the need for a CPAP machine, and that she see a cardiologist with regard to the unexplained recurrent edema in her legs. He also recommended testing of her

---

[39]    Rec. Doc. 8-1 at 405-415.

lower extremities to verify peripheral neuropathy and rule out intrinsic muscular disease.  He noted that her symptoms were "diverse and puzzling."

The claimant again saw Dr. Craft on August 22, 2014.[40]  She reported increased pain, irritability, and frustration in dealing with her young son.  She was tearful, and her mood was low.  Dr. Craft's diagnosis was mood disorder secondary to chronic pain/neuropathy.  He noted that the claimant "shows impairment of overall functioning day-in and day-out" and was "in jeopardy for further decompensation and deterioration without appropriate psychopharmacologic interventions."  He discontinued her Vimpat, started a trial of Lamictal, and maintained the Viibryd and Wellbutrin XL.

The claimant returned to Dr. Begnaud on September 3, 2014 for EMG/NCS [electromyogram/nerve conduction study] testing of both legs.[41]  The findings were compatible with bilateral tarsal tunnel syndrome.  However, the claimant was not a surgical candidate because her white blood cell count was elevated, evidencing an inflammatory or infectious condition.  The claimant explained to Dr. Begnaud that she has multiple boils that come and go without ever fully resolving and showed them to him.  It was his opinion that these should be cured before referring the claimant to

---

[40]        Rec. Doc. 8-1 at 357-358.

[41]        Rec. Doc. 8-1 at 394-404.

a hematologist to uncover any potential pathological cause of her persistent elevated white count.  He prescribed Lasix and potassium for her edema, and he recommended a sleep study.

The claimant saw Dr. Landry again on September 25, 2014[42] in follow up with regard to her diabetes, hypertension, hyperlipidemia, and obesity.  Her diabetes was described as worsening and uncontrolled, and she was started on Jardiance.  Her other medications were continued.

The claimant returned to Dr. Begnaud on October 8, 2014 to follow up with regard to her body pain.[43]  She was referred to Dr. Vitalis Okechukwu, an infectious disease doctor, with regard to her skin condition.  The claimant reported that she was having excruciating pain in her feet, which increased every month at the time of her cycle.  Her Norco was refilled, she was using the Pennsaid gel as needed, labs were done with her gynecologist, she had an appointment scheduled with her gynecologist, a home sleep study was pending, and she was going to schedule an appointment with a cardiologist after seeing the infectious disease doctor.  Dr. Begnaud was awaiting the evaluation and treatment by the infectious disease doctor.

---

[42]      Rec. Doc. 8-1 at 366-367.

[43]      Rec. Doc. 8-1 at 390-393.

The claimant saw Dr. Okechukwu on October 14, 2014.[44]  Upon examination, he noted multiple subcutaneous nodules and scars from old lesions.  He diagnosed hidradenitis suppurativa and recommended a Doxycycline prescription, but the claimant indicated that she would not take this antibiotic unless she decided to proceed with foot surgery.

On October 22, 2014, Dr. Craft completed a mental residual functional capacity assessment.[45]  He noted that he had seen the claimant bi-weekly between July 2014 and August 22, 2014.  He diagnosed her with mood disorder secondary to medical condition of chronic pain, rated her current GAF at 40,[46] estimated her highest GAF over the past year at 45 to 50, and opined that her prognosis was fair since her current response was poor.  He rated the claimant's functionality in several categories,

---

[44]     Rec. Doc. 8-1 at 387-389.

[45]     Rec. Doc. 8-1 at 352-355.

[46]     The global ability to function or GAF scale is used to rate an individual's "overall psychological functioning."  American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") 32 (4th ed. 1994).  The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status.  A GAF score in the 31 to 40 range signifies some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood, such as a depressed person avoiding friends, neglecting family, and being unable to work.  A GAF score in the 41 to 50 range indicates "serious symptoms" such as suicidal ideation and any serious impairment in social, occupational, or school functioning such as the inability to keep a job.  The GAF scale was omitted from DSM–5 because of its "conceptual lack of clarity. . . and questionable psychometrics in routine practice." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–5") 16 (5th ed. 2013).

indicating that he found the claimant extremely limited in the ability to perform activities within a schedule, maintain regular attendant, and be punctual.  He also found her extremely limited in the ability to complete a normal work day and work week without interruptions from psychologically-based symptoms.  Additionally, he found her extremely limited in the ability to respond appropriately to changes in the work setting and in the ability to tolerate normal levels of stress.  He opined that her impairment substantially interferes with her ability to work at least twenty percent of the time, estimated that she would miss five to ten days of work per month due to her mental impairment or treatment for her mental impairment, and stated that, in his opinion, the claimant was incapable of working on a regular and sustained basis.  He stated that the claimant's inability to concentrate and her inability to focus without distraction from pain impede her ability to work.

The claimant saw Dr. John L. Fuselier at Acadiana Womens Health Group on November 3, 2014 for her annual examination.[47]  She was started on Vitamin D, and testing showed an abundance of lactobacillus.  Dr. Fuselier strongly recommended weight loss surgery.

---

[47]        Rec. Doc. 8-1 at 417-422.

On November 5, 2014, the claimant saw Dr. Begnaud again.[48]  She was crying, stated that her blood sugar and pain level were both out of control, and complained about her sleep apnea and anxiety.  She also explained that her psychiatrist will not be seeing patients any longer and will be replaced by a nurse practitioner.  She had not started taking Lasix for the fluid in her feet because of a change in diabetes medications, but it was decided that she would stop the diabetic medication and start the Lasix.  Dr. Begnaud noted that he agreed with Dr. Okechukwu that the infectious skin condition must be eradicated before surgical treatment of her feet could be seriously considered.  She was given a lengthy prescription for Doxycycline with a plan to follow up in a few weeks to see if it was improving her white blood count. If the antibiotic was not successful, she would need to see a hematologist.  Because she was teary-eyed, Dr. Begnaud spent some time encouraging her.

The claimant saw Dr. Landry again on November 17, 2014.[49]  She had developed vaginal candidiasis as a result of taking Jardiance but discontinuation of that medication resolved her symptoms.  She was continuing treatment for her bilateral lower extremity discomfort with a pain management doctor, and her hydrocodone therapy had been increased.  She was also being treated for a Vitamin

---

48      Rec. Doc. 8-1 at 383-386.

49      Rec. Doc. 8-1 at 364-365.

B12 deficiency and a Vitamin D deficiency.  To treat her uncontrolled diabetes, Dr. Landry added Tradjenta in addition to her Metformin.

On December 3, 2014, the plaintiff again saw Dr. Begnaud.[50]  She reported that she had started the Doxycycline but thought it was giving her a vaginal yeast infection.  She also reported that she was in the process of scheduling a sleep study. She complained about pain in both feet that she described as 10/10.  Medication for the yeast infection was prescribed.  Dr. Begnaud was awaiting laboratory studies regarding her white blood count.

On December 8, 2014, the claimant saw a nurse practitioner, Valecia Vaughn, at the Abbeville General Rural Health Clinic.  She became tearful during the session and stated that her pain causes irritability.  Her medications were Viibryd, Wellbutrin XL, and Lamictal.  It was noted that the claimant remained symptomatic, showed impairment of her overall functioning, and was in danger of further decompensation and deterioration without appropriate psychopharmacologic intervention.  The plan was to increase the dosage of Lamictal, maintain the other medications, and return in four weeks.  The claimant was also encouraged to do upper body exercises.

---

[50]      Rec. Doc. 8-1 at 378-381.

The claimaint returned to Dr. Begnaud on January 7, 2015.[51]  She was still taking Doxycycline, Lasix, and Potassium and continued to complain of pain.  She was referred to Dr. Nguyen for blood in her stools and was scheduled to see Dr. Landry with regard to an umbilical hernia.  She had not yet done the sleep study because it had been determined that an inpatient sleep study would be best and the paperwork was being done.  Dr. Begnaud noted that the Doxycycline had decreased but not completely cured her boils but not decreased her white blood count; therefore, he planned to refer her to a hematologist.

On February 19, 2015, the claimant telephoned Dr. Begnaud's office[52] and reported that she had finished the Doxycycline and began breaking out in new boils.  Her prescription was renewed.  Her prescriptions for Ambien and Norco were also refilled, and she was referred to Dr. Chancellor Donald.

The claimant saw Dr. Donald on March 4, 2015 for leukocytosis (elevated white blood cell count).[53]  At that point, she had been taking Doxycycline for three months.  Dr. Donald found that she was mildly anemic and had microcytosis

---

[51]     Rec. Doc. 8-1 at 476-481, 628.

[52]     Rec. Doc. 8-1 at 473-474.

[53]     Rec. Doc. 8-1 at 460-472.

(unusually small red blood cells). He suspected that because of her chronic hidradenitis, the elevated white cell count was likely due to chronic infection.

A sleep study document was prepared by Dr. Roger E. Stueben on March 10, 2015 at Our Lady of Lourdes Hospital.[54] The claimant reported to Dr. Stueben that she had been diagnosed with obstructive sleep apnea syndrome in 2007 and placed on CPAP therapy, but cannot tolerate the CPAP mask and consequently rarely uses the CPAP machine. Examination revealed moderate nasal septal deviation to the right and much reduced nasal patency as well as a narrowing of the hard palate and the floor of the mouth, mildly increased tongue size, and very low soft palate and uvula. Dr. Stueben recommended conversion to a different type of CPAP mask.

The claimant followed up with Dr. Donald on March 18, 2015.[55] His impression again was leukocytosis likely due to chronic inflammation and infection related to hidradenitis.

The claimant saw Dr. Landry on March 30, 2015 to follow up with regard to hypertension, diabetes, and hypertriglyceridemia.[56] He noted that her hypertension

---

[54]     Rec. Doc. 8-1 at 457-459.

[55]     Rec. Doc. 8-1 at 454-456.

[56]     Rec. Doc. 8-1 at 555-558.

was well controlled but her diabetes was uncontrolled.  He reinforced the importance of a low carbohydrate diet and exercise and modified her medication regimen.

On April 6, 2015, the claimant followed up with Dr. Begnaud.  She was still taking the Doxycycline and her white blood count had started to come down.  She had started on a new diabetes drug, Invokana.  She was taking antibiotics for a recent root canal.  She continued to complain of pain in both feet.  She requested a referral to a psychiatrist.  Dr. Begnaud planned to await improvement with the use of a new CPAP machine and continued her medications, including the antibiotics.

That same evening, a sleep study was conducted at Our Lady of Lourdes Hospital, which revealed severe obstructive sleep apnea syndrome.[57]

On August 26, 2015, the claimant again saw Dr. Landry.[58]  His primary assessment was anxiety state, unspecified, and he started her on Ativan.  He discontinued diabetes drugs Invokana and Tradjenta and started the claimant on Toujeo Solostar Solution.  He also changed the medication she was taking for hyperglyceridemia.

---

[57]      Rec. Doc. 8-1 at 622-628.

[58]      Rec. Doc. 8-1 at 551-554.

On September 2, 2015, the claimant was evaluated by nurse practitioner Lecy Broussard of Acadiana Psych Associates, LLC.[59]  She complained of anxiety and depression, poor sleep quality, the recent death of her mother, and foot pain.  Nurse Broussard noted that her affect was constricted, her mood was sad, and her concentration was fair.  She was referred to a social worker for individual therapy, and she was to continue taking her medications, follow an exercise program, eat a low carbohydrate diet, work on improving self-esteem issues, and practice stress management techniques.

The claimant returned to Dr. Begnaud on September 16, 2015.[60]  She reported that she had begun seeing nurse practitioner Lecy Broussard for mental health treatment and was still taking Doxycycline.  Because her boils were better but not completely controlled with the Doxycycline, Dr. Begnaud discontinued that medication and substituted Bactrim.  He also prescribed Diflucan in case she developed a yeast infection while on the Bactrim.  She had been unable to use the new CPAP machine due to bronchitis.  Dr. Begnaud planned to recheck her tarsal tunnel syndrome and obtain an EMG to check for residual diabetic neuropathy versus the tarsal tunnel syndrome since a year had elapsed since diagnosis.

---

[59]     Rec. Doc. 8-1 at 592-593.

[60]     Rec. Doc. 8-1 at 602-606.

The claimant again saw Nurse Practitioner Broussard on November 9, 2015.[61] She reported being very depressed and having a lot of anxiety. She was not sleeping well, and she was crying and feeling hopeless. She indicated that she was having more depression, a lack of motivation, no energy, and weight gain. She explained that she was unable to use her CPAP machine due to claustrophobia. The diagnoses assigned were severe major depression, anxiety, insomnia, and circadian rhythm sleep disorder. Her medications were adjusted. Nutrition and exercise were discussed, as well as improving self-esteem and managing stress.

On November 24, 2015, the claimant returned to Nurse Broussard.[62] A new diagnosis of binge eating disorder was added along with the existing diagnoses of severe major depression, anxiety, insomnia, and circadian rhythm sleep disorder. The claimant's affect was constricted, her mood was depressed, and her concentration was impaired. She cried when the binge eating disorder was diagnosed. She expressed feelings of helplessness and guilt and discussed her eating patterns in relation to stress. Her medications were adjusted, education was provided on the new diagnosis, and exercise and nutrition were discussed as well as triggers for binge eating, working on improving her self-esteem, and stress management.

---

[61]     Rec. Doc. 8-1 at 590-591.

[62]     Rec. Doc. 8-1 at 588-589.

Findings of the EMG/NCS testing of both lower extremities performed by Dr. Begnaud on December 2, 2015 were consistent with a generalized peripheral neuropathy such as that induced by diabetes but he could not rule out a residual tarsal tunnel syndrome on the right.[63]

On December 8, 2015, Nurse Broussard filled out a medical source statement,[64] in which she opined that the claimant had major depression, recurrent, severe; anxiety; and a binge eating disorder with severe impacts on the occupational and social aspects of her life. The prognosis was guarded, and she rated the claimant's current GAF at 35, with the highest GAF over the past year estimated to be 40.[65]  In Nurse Broussard's opinion, the claimant had extreme limitations in the ability to understand and remember detailed instructions and the ability to carry out detailed instructions. She also found that the claimant had extreme limitations in the ability to maintain regular attendance and punctuality, to sustain an ordinary routine, and to complete a normal work week without interruptions from psychological symptoms. She opined that the claimant had moderate limitations in all aspects of social

---

[63]    Rec. Doc. 8-1 at 599-601.

[64]    Rec. Doc. 8-1 at 610-613.

[65]    According to the DSM–IV, a GAF score in the 31 to 40 range signifies some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood, such as a depressed person avoiding friends, neglecting family, and being unable to work.

-26-

interaction addressed.  She also found that the claimant had extreme limitations in the ability to travel to and from work and to tolerate normal work place stress as well as marked limitations in the ability to make simple work related decisions, respond appropriately to changes in the work place, to be aware of and take appropriate precautions for normal hazards, and to set realistic goals or make independent plans. In her opinion, the claimant's psychological symptoms would routinely interfere with the ability to maintain attention at work for more than 20% of an eight-hour work day and at least one day out of five.  She estimated that the claimant would miss work due to her mental impairment or treatment fifteen days per month.

On December 14, 2015, the claimant testified at a hearing regarding her symptoms and her medical treatment.  At the time of the hearing, the claimant was taking nineteen prescription medications.[66]  She explained that she had been laid off from a nursing job because she was falling asleep on the job – at her desk, in patient's homes, and while driving.  She attributed her daytime sleepiness to the medications she was taking for pain and neuropathy in her feet.  She testified that, since stopping work, her neuropathy and her daytime sleepiness had gotten worse.  She confirmed that she underwent a sleep study but stated that she became claustrophobic using the CPAP machine.  She also explained that sleeping better at night does not prevent her

---

[66]    Rec. Doc. 8-1 at 231-233.

medications from making her drowsy during the day. She estimated that she can only walk or stand for about ten or fifteen minutes at a time. She described swelling in her feet that is treated with Lasix and with keeping her feet elevated. She also described the skin problem called hidradenitis suppurativa and stated that it never totally goes away. The claimant testified that her depression and anxiety have significantly worsened to the point that she does not want to leave her house, finds it difficult to participate in her son's life, and cries easily. She stated that she was unable to continue treating with psychiatrist Dr. Craft because he stopped seeing patients at the clinic where she saw him and he also stopped taking new private patients. The changes in Dr. Craft's practice required her to seek psychiatric care from nurse practitioner Lecy Broussard. She complained that changes in her medication resulted in insomnia, swelling, and weight gain. She stated that she was 5' 7" and weighed 303 lbs. She explained that she had difficulty helping her son with his homework and does very little housework. In fact, she stated that "all of the responsibilities of working and household and shopping and everything is put on" her husband. While she indicated that she could do a few tasks such as washing a few dishes and wiping the counter, she cannot clean floors or bathrooms. The claimant indicated that the medical problem that is most limiting is the pain and burning in her feet; the next

most limiting problem is her inability to stay awake.  She testified that her blood glucose level remains high even though she was following a diabetic diet.

The claimant now seeks reversal of the Commissioner's adverse ruling.

## ANALYSIS

### A.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[67] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[68]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[69]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[70]  In reviewing the Commissioner's findings, a court

_____

[67]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[68]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[69]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[70]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[71]    Conflicts in the evidence[72] and credibility assessments[73] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[74]

## B.    ENTITLEMENT TO BENEFITS

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[75]  A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death

---

[71]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[72]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[73]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[74]    *Wren v. Sullivan*, 925 F.2d at 126.

[75]    See 42 U.S.C. § 423(a).

or which has lasted or can be expected to last for a continuous period of not less than twelve months."[76]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[77]

## C.    EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This process requires the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[78]

---

[76]    42 U.S.C. § 1382c(a)(3)(A).

[77]    42 U.S.C. § 1382c(a)(3)(B).

[78]    20 C.F.R. § 404.1520.

"A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[79]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[80] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[81]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[82]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[83]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[84]  If the Commissioner

---

[79]    *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[80]    20 C.F.R. § 404.1520(a)(4).

[81]    20 C.F.R. § 404.1545(a)(1).

[82]    20 C.F.R. § 404.1520(e).

[83]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[84]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[85]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[86]

### D.    THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since February 25, 2013.[87]  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  degenerative disc disorder, diabetes mellitus, neuropathy, and affective disorder.[88]  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[89]  The claimant does not challenge this finding.

---

[85]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[86]    *Greenspan v. Shalala*, 38 F.3d at 236.

[87]    Rec. Doc. 8-1 at 23.

[88]    Rec. Doc. 8-1 at 23.

[89]    Rec. Doc. 8-1 at 24.

The ALJ found that the claimant has the residual functional capacity to perform sedentary work with certain qualifications. She can occasionally operate foot controls bilaterally and occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl but never climb ladders and scaffolds. She can occasionally tolerate exposure to unprotected heights and moving mechanical parts, and she can occasionally operate a motor vehicle. She is limited to simple tasks that are not at a production rate pace (e.g. assembly line work), but she can perform goal-oriented work (e.g. office cleaner). She is limited to work with simple work-related decisions, few changes in the routine work setting, and frequent interaction with supervisors, coworkers, and the public.[90] The claimant challenges this finding.

At step four, the ALJ found that the claimant is not capable of performing any past relevant work.[91] The claimant does not challenge this finding.

At step five, the ALJ found that the claimant was not disabled from February 25, 2013 through February 25, 2016 (the date of the decision) because there are jobs in the national economy that she can perform.[92] The claimant challenges this finding.

---

[90]    Rec. Doc. 8-1 at 25.

[91]    Rec. Doc. 8-1 at 34.

[92]    Rec. Doc. 8-1 at 35.

E.    THE ALLEGATIONS OF ERROR

The claimant contends that the ALJ erred (1) in failing to properly evaluate her doctors' medical opinions; (2) in failing to properly evaluate her credibility; (3) in failing to consider the side effects of medical treatment on her ability to sustain employability, and (4) in failing to properly evaluate her residual functional capacity.

F.    THE ALJ FAILED TO PROPERLY EVALUATE THE TREATING PHYSICIANS' MEDICAL OPINIONS

The Social Security regulations and rulings explain how medical opinions are to be weighed.[93]  Generally, the ALJ must evaluate all of the evidence in the case and determine the extent to which medical source opinions are supported by the record. In this case, the claimant's application is governed by the "treating source rule," which provides that a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.[94]  If an ALJ declines to give controlling weight to a treating doctor's opinion, he may give the opinion little or no weight – but only after showing good cause for doing so.[95]  Good cause may be shown if the

---

[93]    20 C.F.R. § 404.1527(c), § 416.927(c), SSR 96-2p, SSR 96-5p.

[94]    20 C.F.R. § 404.1527(d)(2); *Martinez v. Chater*, 64 F.3d at 176.

[95]    *Thibodeaux v. Astrue*, 324 Fed. App'x 440, 443-44 (5th Cir. 2009).

treating physician's opinion is conclusory, unsupported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence.[96]

In this case, the ALJ gave little weight to psychiatrist Dr. Craft's opinions but gave great weight to the opinions of state agency consultant Kelly Ray, Ph.D.  The ALJ discounted Dr. Craft's opinions because "he saw the claimant only two to three (2-3) times briefly."[97]  However, Dr. Craft's functional capacity assessment stated that he saw the claimant biweekly from July through August 2014 and the evidence in the record shows that he continued treating her through December 2014.  The ALJ discounted Nurse Broussard's opinions for the same reason, but she also stated that she saw the claimant biweekly from September through December 2015.  Despite discrediting Dr. Craft's opinions for the alleged lack of a lengthy period of treatment, the ALJ then gave greater weight to the opinions of someone who did not examine the claimant at all.  "[T]he opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician."[98]  Therefore, the ALJ improperly weighed the medical opinions.

---

[96]    *Thibodeaux v. Astrue*, 324 Fed. App'x at 443-44.

[97]    Rec. Doc. 8-1 at 32.

[98]    *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987).

Furthermore, Dr. Ray appears to be a psychologist based on the fact that the letters "Ph.D" rather than the letters "M.D." follow her name. The opinions of a specialist – a psychiatrist such as Dr. Craft – should be given more weight than the opinions of someone lacking in the specialist's training and experience.[99] Therefore, it was improper to give greater weight to Dr. Ray's opinions than to Dr. Craft's.

The second reason given by the ALJ for the lack of weight given to Dr. Craft's opinions is that "the severe limitations imposed are not supported by the evidence."[100] But the ALJ did not cite to any conflicting evidence in the record. The best evidence of the claimant's psychological impairment is found in the treatment notes created by Dr. Craft and Nurse Broussard when they examined the claimant, but those treatment notes were not in the record at the time that Dr. Ray evaluated the claimant's impairments. Thus, the record from which Dr. Ray formulated her conclusions was lacking information that was available to both Dr. Craft and Nurse Broussard when they formulated their opinions concerning the severity of the claimant's condition. Therefore, her opinions should not have been weighed more heavily than Dr. Craft's.

The ALJ did not identify a medical opinion in the record that contradicts Dr. Craft's opinion, and Dr. Ray's report cannot be used to contradict Dr. Craft's

---

[99]    20 C.F.R. § 404.1527(c)(5).

[100]    Rec. Doc. 8-1 at 32.

opinions.  The reports of physicians who did not examine the claimant do not constitute substantial evidence on which to base an administrative decision.[101] Therefore, it would be improper for the ALJ to conclude, on the basis of the content of Dr. Ray's report, that Dr. Craft's conclusions are not supported by the evidence in the record.

Finally, the ALJ is not a physician; consequently, the ALJ is not permitted to substitute her own opinion for that of Dr. Craft.  "Although the ALJ may weigh competing medical opinions about. . . limitations and use objective medical evidence to support its determination that one opinion is better founded than another, neither the ALJ nor the court is free to substitute its own opinion."[102]

Because the ALJ identified no evidence in the record that contradicts Dr. Craft's conclusions and because Dr. Craft was the claimant's treating physician when he reported his opinions, the ALJ should have given his opinions controlling weight. That did not occur.  Therefore, the ALJ applied an improper legal standard in weighing the medical opinions, which requires that this matter be remanded.

---

[101]    *Kneeland v. Berryhill*, 850 F.3d 749, 761 (5th Cir. 2017) (citing *Strickland v. Harris*, 615 F.2d 1103, 1109 (5th Cir. 1980)).

[102]    *Fabre v. Astrue*, No. 13-00076-BAJ-RLB, 2014 WL 4386424, at *6 n. 6 (M.D. La. Sept. 4, 2014).

### G.    THE ALJ FAILED TO PROPERLY EVALUATE THE CLAIMANT'S CREDIBILITY

The ALJ found the claimant only partially credible, based primarily on what the ALJ termed "compliance issues."[103]   First, the ALJ criticized the claimant for being noncompliant with dietary restrictions for diabetic patients.  While the ALJ is correct that the record documents noncompliance with diet goals, the ALJ failed to consider that the claimant was diagnosed with a psychological binge eating disorder,[104] which might contribute to her inability to maintain compliance with dietary standards that would aid in controlling her diabetes.

Second, the ALJ stated that the claimant was advised to follow up with Maurice Community Care Clinic but there was no evidence that she did so.  That conclusion is based on a less than careful reading of the record.  The claimant saw both Dr. Craft and Nurse Practitioner Valecia Vaughn at the Maurice clinic. Although their treatment notes are titled "Abbeville General Rural Health Clinic," Dr. Craft stated in his treatment note of August 22, 2014 that the claimant "will be maintained in current programming *here* in the Maurice Community Care Clinic,"[105] and Nurse Vaughn made a similar statement in her treatment note of December 8,

---

[103]      Rec. Doc. 8-1 at 33.

[104]      Rec. Doc. 8-1 at 588-589.

[105]      Rec. Doc. 8-1 at 358 [emphasis added].

2014.[106]  Thus, the Abbeville General Hospital's rural health clinic was the same as the Maurice Community Care Clinic.

Third, the ALJ criticized the claimant for failing to immediately fill prescriptions for Lasix and Potassium to treat edema.  But the delay in starting the Lasix was due to a need to coordinate the medications prescribed by Dr. Landry and those prescribed by Dr. Begnaud.  As Dr. Begnaud explained in his treatment note from November 5, 2014, the claimant reported that she had not started the Lasix due to taking a new medication for diabetes, and it was decided at that time that the diabetes medication would be stopped and the Lasix would then be started.[107]  Therefore, the delay in starting the Lasix cannot be attributable to non-compliance by the claimant with her doctor's recommendations; instead, it is attributable to the claimant's conscientious attempt to comply with the recommendations of all of her doctors.  The ALJ also noted that the claimant was offered an antibiotic for her skin condition, hidradenitis suppurative and her high white blood cell count but declined to take it.  The ALJ failed to note that, after discussing this proposed treatment with Dr. Begnaud, she then took the antibiotic for several months.[108]

---

[106]    Rec. Doc. 8-1 at 522.

[107]    Rec. Doc. 8-1 at 383.

[108]    Rec. Doc. 8-1 at 460-472; Rec. Doc. 8-1 at 473-475.

Fourth, the ALJ stated that the claimant was non-compliant because she rarely used her CPAP machine. But the record indicates that the structure of the claimant's nose and mouth were incompatible with her first CPAP mask and that her second CPAP mask caused claustrophobia, as documented in the medical record as well as in the claimant's hearing testimony.[109] Thus, the claimant's failure to use a CPAP machine every night was not the result of mere non-compliance on her part.

Finally, the ALJ criticized the claimant's credibility on the basis that she failed to seek physical or mental health treatment after December 2015, and the ALJ found this alleged lack of treatment to be incompatible with the severity of impairment claimed by the claimant. But the hearing was held on December 14, 2015 and the ALJ's opinion, dated February 25, 2016, was based on medical records submitted before the hearing date. The record is clear that the claimant was receiving care from multiple health care providers right up to the date of the hearing. It defies logic to expect a claimant to submit medical records postdating the hearing date unless there has been a significant change in her condition or a failure to document medical care received before the hearing – neither of which is the case here – and it also defies logic that any such alleged failure could be held against the claimant.

---

[109]    Rec. Doc. 8-1 at 457-459; Rec. Doc. 8-1 at 55, 590.

There is ample evidence in the record supporting a conclusion that the claimant was compliant with her doctors' orders and recommendations. Therefore, it appears that the ALJ was picking and choosing evidence from the record that supported her own adverse conclusion and omitting mention or consideration of contrary evidence. An ALJ must consider all of the evidence in a case and cannot "pick and choose" only that evidence that supports a finding of nondisability.[110] Thus, in evaluating the claimant's credibility, the ALJ applied an improper legal standard, and reached a conclusion not supported by substantial evidence in the record. This error mandates reversal of the Commissioner's ruling.

## H.    THE ALJ FAILED TO CONSIDER THE EFFECTS OF MEDICAL TREATMENT ON THE CLAIMANT'S ABILITY TO SUSTAIN EMPLOYABILITY

The record establishes that the claimant had a problem with extreme sleepiness resulting in a lack of focus and difficulty concentrating, which were side effects of the various pain medications that she was taking. While she had some limited improvement while taking Nuvigil, that medication did not cure the problem. Dr. Landry noted this problem in his treatment notes based on his interactions with the claimant in the workplace, and Dr. Craft and Nurse Broussard both focused on this problem in their function analyses. The ALJ, however, gave little consideration to

---

[110]    *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

this factor when evaluating the claimaint's residual functional capacity.  Although the ALJ noted that Dr. Craft opined that the claimant would be unable to sustain work particularly due to sedation and difficulty concentrating, the ALJ disputed Dr. Craft's assessment, noting simply that "the medical records. . . sometimes shows [sic] normal mood and affect."[111]  The ALJ must consider medication side effects when evaluating a claimant's symptoms.[112]   Additionally, the Fifth Circuit has held that if an individual's medical treatment significantly interrupts the ability to perform a normal, eight-hour work day, then the ALJ must determine whether the effect of treatment precludes the claimant from engaging in gainful activity.[113]  The ALJ's evaluation of the claimant's residual functional capacity fails to take into account the somnolence and sedation resulting from the claimant's pain medications, and this constitutes error.  For that reason, the ALJ's residual functional capacity finding was not reached by applying the proper legal standard and is not supported by substantial evidence in the record.

---

[111]    Rec. Doc. 8-1 at 33.

[112]    20 C.F.R. § 404.1529(c)(3)(iv); *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999). See, also, e.g., *Romero v. Commissioner of Social Security*, No. 14-3001, 2016 WL 4882446, at *12 (W.D. La. Feb. 17, 2016), report and recommendation adopted, 2016 WL 4883300 (W.D. La. Sept. 13, 2016) (remanded for consideration of drowsiness and sedation that were side effects of medications including Abilify, Ambien, Lexapro, and Lyrica).

[113]    *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000) (citing *Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1980)).

# I.   THE ALJ FAILED TO PROPERLY EVALUATE THE CLAIMANT'S RESIDUAL FUNCTIONAL CAPACITY

The ALJ is responsible for determining a claimant's residual functional capacity.[114]  In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations.  "The regulations require the ALJ to determine residual functional capacity by considering all of the relevant evidence and addressing the claimant's exertional and non-exertional limitations."[115]

The claimant argued that the ALJ erred in evaluating her residual functional capacity by failing to account for the non-exertional limitations that resulted from her psychological condition.  As noted above, the claimant's treating psychiatrist and treating psychological nurse practitioner indicated in their function reports that the claimant has multiple functional limitations due to depression, anxiety, and chronic pain.  The ALJ concluded, however, that "this is not supported by the medical records, which sometimes shows normal mood and affect."[116]  The ALJ also

---

[114]    *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

[115]    *Irby v. Barnhart*, 180 Fed. App'x 491, 493 (5th Cir. 2006) (citing 20 C.F.R. §§ 404.1545, 419.945; SSR 96-8p).

[116]    Rec. Doc. 8-1 at 33.

concluded that "the severe mental health limitations imposed by [nurse practitioner] Ms. Broussard are not supported by the record,"[117] presumably also because the record "sometimes shows normal mood and affect."

The record is clear that the claimant sought mental health treatment for depression long before her claimed disability onset date. Her psychiatrist, Dr. Craft, opined that she could not work on a regular and sustained basis due to psychological impairments. Thus, there is evidence in the record that her psychological condition caused limitations that were not factored in to the ALJ's residual functional capacity assessment. Thus, the ALJ's adverse conclusion was not based on application of the appropriate legal standard and is not supported by substantial evidence in the record.

### CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to properly weigh and evaluate the medical opinions of the claimant's treating medical care providers; properly evaluate the claimant's credibility; consider the side effects of the claimant's medical treatment in evaluating her residual functional capacity; and

---

[117]    Rec. Doc. 8-1 at 33.

properly evaluate the plaintiff's residual functional capacity, particularly in light of her psychological impairments.

Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[118]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual

---

[118]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[119]

Signed at Lafayette, Louisiana, this 12th day of March 2018.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[119]     See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).